**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

RGT INVESTMENTS, LLC, et al.,                Case No. 1:21-cv-546
     Plaintiffs,                             Litkovitz, M.J.

     vs.

DJ STEAKBURGERS, LLC,                  **ORDER**
     Defendant.

This matter is before the Court on the parties' cross-motions for summary judgment

(Docs. 23, 24), responses in opposition (Docs. 25, 26), reply memoranda (Docs. 27, 28), and

supplemental briefs following oral argument on the motions (Docs. 34, 37).

**I.  Undisputed Facts**

This lawsuit arises following two payments distributed by the Ohio Bureau of Workers'

Compensation ("BWC") to defendant, DJ Steakburgers, LLC ("DJS" or "defendant"), following

the sale of assets related to seven Freddy's Frozen Custard & Steakburgers franchises (the

"Restaurants").

Plaintiffs RGT Investments, LLC ("RGT") and PSP Foods, LLC ("PSP") owned and

operated the Restaurants located in various locations throughout Southwest Ohio.  (Doc. 23-2,

Kimberly Wimberly Decl., at PAGEID 158).  "PSP owned the property used to operate and

operated the Restaurants, while RGT held either ownership or leasehold interests in the land

underlying the Restaurants."  (*Id*.).  On June 25, 2020, plaintiffs and defendant entered into an

Asset Purchase Agreement ("Agreement") for the sale of the Restaurants.  (*Id*. at PAGEID 159;

*see also* Doc. 1-1, Agreement).  The Agreement provided:

> PSP desires to sell and assign, and Buyer desires to acquire and assume, all or
> substantially all of the assets used in connection with [the] Restaurants and RGT
> desires to sell, and Buyer desires to acquire, the Fee Properties, in all cases subject
> to and in accordance with the terms of this Agreement (the "***Transactions***").

(Doc. 1-1 at PAGEID 8) (emphasis in original).

The Agreement designated particular items as "excluded assets" from the transaction. (*Id*.). The Agreement specified that "[n]otwithstanding the foregoing, the Assets shall not include the exclusions set forth in <u>Section 1.2</u> herein (the '***Excluded Assets***')." (*Id.*) (emphasis in original). In turn, Section 1.2 provides:

> **1.2** <u>**Excluded Assets.**</u> The following items shall be excluded from the definition of Assets and shall not be conveyed to Buyer (collectively, the "***Excluded Assets***"):
>
> **1.2.1** all of PSP's federal, state, local, and other tax returns, reports, declarations, and applications related to taxes ("***Tax Returns***") and other sales, accounting and business records which are not required or reasonably necessary to the operation of the Restaurants;
>
> **1.2.2** any tax credits, tax refunds, tax benefits, or other benefits relating to periods prior to the Closing Date;
>
> **1.2.3** other than the Cash Banks, all cash in bank accounts, deposits, and accounts receivable;
>
> **1.2.4** all automobiles and cellular phones used by PSP's managers, district managers and operations personnel;
>
> **1.2.5** all furniture, fixtures, and equipment located at PSP's corporate office, located at 6389 N. Quail Hollow, Suite 101, Memphis, TN 38120, and the leasehold or fee interest at said office;
>
> **1.2.6** all deposits on hand with lessors, vendors, or utility companies;
>
> **1.2.7** employment records and personnel files of employees (provided that, with respect to certain employees designated by Buyer, such files and records shall be made available to Buyer for Buyer's review prior to Closing in accordance with applicable law in connection with decisions by Buyer whether or not to employ such employees); and
>
> **1.2.8** all assets that are not located at the Restaurants; and
>
> **1.2.9** except for the assets listed in Section 1.1.6, assets owned by Franchisor and used in connection with PSP's business, but PSP shall assign all of PSP's interests in such assets to Buyer at Closing.

(*Id*. at PAGEID 9-10).  The Agreement also provided that upon closing, defendant would "offer employment to all of the employees of PSP performing services at the Restaurants."  (*Id*. at PAGEID 23, Section 5.4.3).  On September 15, 2020, the parties closed on the transaction.  (Doc. 23-2, Kimberly Wimberly Decl., at PAGEID 160).

In October 2020, after the closing date, DJS and non-party RGT Management, Inc. ("RGT Management") executed a U-118 Form, which transferred the BWC account and rating from RGT Management to DJS.  (Doc. 24-5; *see also* Doc. 23-2, Kimberly Wimberly Decl., at PAGEID 160).  The U-118 Form stated that RGT Management "is the employer of record for multiple affiliated companies including PSP Foods."  (Doc. 24-5 at PAGEID 308).  The U-118 Form provided that DJS was the "succeeding employer" and RGT Management was the "former employer" for purposes of Ohio workers' compensation coverage.  (*Id*. at PAGEID 307).  The U-118 Form specified that DJS retained all of the employees from the former employer.  (*Id*. at PAGEID 308).  Section D of the U-118 Form, entitled "Certification," provided the following:

> Furthermore, I am aware that pursuant to BWC Rule 4123-17-02 Basic or manual rate BWC shall transfer the former employer's rights and obligations under the workers' compensation law to the successor employer in addition to any credits of the former employer when one employer wholly succeeds in the operation of the business.  Where one employer wholly or partially succeeds in the operation of the business, the experience of the former employer will be transferred to establish the rate of the succeeding employer.

(*Id*. at PAGEID 309).

In December 2020, approximately two months after the closing date, the BWC issued two payments directly to DJS: (1) a dividend pursuant to the COVID-19 dividend program in the amount of $69,746.86 (the "COVID Dividend"), and (2) an employer premium refund invoice for the true-up of overpayment of premiums made by RGT Management to the BWC in the amount of $2,325.48 (the "true-up refund").  (Doc. 23-2, Kimberly Wimberly Decl., at PAGEID

161-62; Doc. 23-7; Doc. 23-9).  DJS retained both payments that it, as the successor employer, received from the BWC.  (Doc. 23-2, Kimberly Wimberly Decl., at PAGEID 162).

On these facts, plaintiffs filed the instant lawsuit alleging claims of breach of contract and unjust enrichment.  (Doc. 1).  In its answer to plaintiffs' complaint, defendant asserted a counterclaim for breach of contract against plaintiffs based on plaintiffs' refusal to release funds held in escrow allegedly owed to defendant.  (Doc. 8).

Both parties now seek summary judgment on the respective claims.

## II.  Standard of Review

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002).  The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party.  *Id.*; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial.  *Anderson*, 477 U.S. at 249.  The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

A fact is "material" if its resolution will affect the outcome of the lawsuit. *Beans v. City of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *5 (N.D. Ohio Dec. 30, 2016), *aff'd*, No. 17-3088, 2017 WL 3726755 (6th Cir. 2017) (citing *Anderson*, 477 U.S. at 248). The party who seeks summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 322. To make its determination, the court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968).

**III. Cross-motions for Summary Judgment (Docs. 23, 24)**

**A. The Parties' Positions**

The parties dispute who is legally entitled to the true-up refund and COVID Dividend payments issued by the BWC to DJS under the Agreement. Plaintiffs also dispute DJS is entitled to a release of the funds held in escrow.

Plaintiffs move for summary judgment on their breach of contract claim on the basis that both payments issued by the BWC constituted "excluded assets" under the Asset Purchase Agreement because each payment "was determined and calculated based on periods that predate"

the closing date of the Agreement under Section 1.2.2.  (Doc. 23 at PAGEID 140).  Plaintiffs

contend that because the "payments were based entirely on periods prior to the Closing Date,

they fall squarely within the inclusion of 'benefits relating to periods prior to the Closing Date'

in the 'Excluded Assets' allocated to Plaintiffs under the plain language of the Asset Purchase

Agreement."  (*Id*. at PAGEID 140-41).

Plaintiffs explain that plaintiff PSP "outsourced management of its account with the

BWC to its affiliate, RGT Management, who would maintain the account with the BWC and pay

the required premiums to the BWC for the employees at the Restaurants."  (*Id*. at PAGEID 144-

45, citing Doc. 23-2 at PAGEID 159).  Plaintiffs allege that "RGT Management paid the

corresponding premiums to the BWC for the July 1, 2019-June 30, 2020 policy year and

completed the true-up process for that year."  (*Id*. at PAGEID 161).

Plaintiffs state that the $2,325.48 true-up payment from the BWC to DJS was the result

of excess workers' compensation premiums paid by RGT Management for the policy year July

1, 2019-June 30, 2020.  (*Id*. at PAGEID 150-51).  At the conclusion of each BWC policy year,

each employer must complete a payroll true-up process with the BWC to reconcile payments

made to the BWC with the amount actually owed based on the number of employees covered

during that policy year.  (Doc. 23-2, Kimberly Wimberly Decl., at PAGEID 161).  Upon

completion of the true-up process, if the employer paid more than what it owed, the BWC will

refund the excess money paid to it back to the employer.  (*Id.*).  Plaintiffs state that RGT

Management paid workers' compensation premiums on plaintiff PSP's behalf, which PSP

funded, to the BWC for the July 1, 2019-June 30, 2020, policy year.  (*Id*. at PAGEID 151, 154-

55; Doc. 34-1, Kimberly Wimberly Aff., at PAGEID 438).  The yearly true-up process resulted

in excess premiums paid by RGT Management to the BWC, i.e., the $2,325.48 true-up payment.

According to plaintiffs, they are entitled to the true-up payment because this refund concerned a period prior to the closing date and therefore constituted an "other benefit[] relating to periods prior to the Closing Date" and an "excluded asset" under Section 1.2.2 of the Agreement.

Similarly, plaintiffs argue that the $69,746.86 COVID-19 dividend payment is an "excluded asset" under Section 1.2.2 of the Agreement.  (Doc. 23-1 at PAGEID 154).  Plaintiffs state that the BWC determined the eligibility for this payment based upon "premiums during the July []1, 2019-Jun[e] 30, 2020 policy year—a period entirely before the September 15, 2020 Closing Date, during which RGT Management paid all premiums." (*Id*.).  Plaintiffs argue that because the amount of the COVID Dividend "depended upon the amounts of premiums that RGT [Management] paid during that period," the $69,746.86 dividend payment is a "benefit[] relating to periods prior to the Closing Date" and an "excluded asset" under the Agreement to which plaintiffs are legally entitled.  (*Id*.).

Defendant contends that summary judgment should be granted in its favor because the plain language of Section 1.2.2 of the Agreement shows the true-up refund and COVID Dividend do not constitute "excluded assets."  (Doc. 24 at PAGEID 213; Doc. 25 at PAGEID 362-65).  Section 1.2.2 expressly lists "tax credits, tax refunds, tax benefits, or other benefits relating to periods prior to the Closing Date" as "excluded assets" under the Agreement.  Defendant argues this provision envisions "only tax scenarios and tax items," and neither the COVID Dividend nor the true-up payment qualify as such.  (Doc. 24 at PAGEID 216).  In addition, Section 1.2.2 does not specifically mention "any insurance premium refunds, workers compensation payments, dividends, or any accounts with state agencies, including the BWC."  (Doc. 25 at PAGEID 362).  Accordingly, the plain language of the Agreement does not identify the true-up refund and COVID Dividend as "excluded assets."  (*Id*. at PAGEID 362-63).

7

Defendant also contends that neither plaintiff is a true party in interest to the COVID Dividend and BWC true-up credited to RGT Management and made payable to DJS because: (1) RGT Management is not a party to the Agreement between plaintiffs and DJS, and (2) RGT Management transferred all its interest, rights, and obligations in the BWC account to DJS through the U-118 Form. (Doc. 24 at PAGEID 207).

Citing cases for the general proposition that a party cannot contract for the right of a third-party, defendant contends that RGT Management was not a party to the Agreement; was not bound by the Agreement's provisions; and was not a third-party beneficiary to the Agreement. (*Id.* at PAGEID 207-08). Nor does the Agreement mention the assets or obligations of non-party RGT Management. As a result, any claim plaintiffs might have under the Agreement is independent of any claim RGT Management might have relating to the BWC.

Defendant states that RGT Management, and not plaintiffs, was the former employer of the Restaurant employees that owned and maintained the BWC account associated with the Restaurants. (*Id.* at PAGEID 208). Defendant alleges that RGT Management, not plaintiffs, received previous dividends and true-up payments from the BWC. (*Id.* at PAGEID 209). When defendant and RGT Management executed the U-118 Form in October 2020, RGT Management transferred its rights and obligations to DJS as the successor employer. (*Id.* at PAGEID 208, citing Doc. 24-5 at PAGEID 307-09). Defendant states this is consistent with Ohio Admin. Code Rule 4123-17-02(C)(1), which provides that the BWC shall transfer the predecessor employer's rights and obligations under the workers' compensation law to the successor employer where one employer wholly succeeds another in the operation of a business. (*Id.*). Defendant argues that "as contemplated by Ohio Courts interpreting R.C. 4123.32 and 4123-17-02, Plaintiffs could never be the proper transferor or transferee of any rights or obligations relating to the BWC

8

account." (*Id.* at PAGEID 209). Defendant asserts that after execution of the U-118 Form, DJS was the only entity eligible to receive the COVID Dividend and true-up payments.

Defendant also points out that its receipt of the COVID Dividend as the successor employer of the BWC account was specifically contemplated by the BWC. BWC guidance provides that "if a company that was billed premium for the July 1, 2019 through June 30, 2020 policy and was sold prior to the dividend, 'the successor will receive the applicable dividend.'" (*Id.*, citing Doc. 24-5 at PAGEID 344-48). Defendant states that the timing of and eligibility requirements for the COVID Dividend further indicate the dividend cannot be an "excluded asset" under Section 1.2.2 of the Agreement. The BWC Board of Directors did not approve the COVID Dividend until November 2, 2020, which was two months after the closing date. (Doc. 25 at PAGEID 367, citing Doc. 24-5 at PAGEID 336-38). In addition, the eligibility for the COVID Dividend "was based on an employer's status with [the BWC] as of October 2, 2020." (*Id.*, citing Doc. 24-5 at PAGEID 344-48). Defendant asserts that because plaintiffs had no active status with the BWC as of October 2, 2020 and did not employ any restaurant employees as of that date, neither plaintiff was an employer who was eligible to receive the COVID Dividend. Rather, DJS – as the successor employer who assumed RGT Management's BWC account – was entitled to the COVID Dividend.

**B. Law on contract interpretation**

In cases like this where federal jurisdiction is based on diversity of citizenship, the Court applies the substantive law of the state in which the district court sits according to the decisions of the state's highest court. *Perry v. Allstate Indem. Co.*, 953 F.3d 417, 421 (6th Cir. 2020) (citing *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013)). In addition, Section 11.2 of the Agreement between the parties requires it to be interpreted under Ohio law. (Doc. 1-1 at

PAGEID 37). "Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citing cases). Where a contract is clear and unambiguous, "a court may not resort to construction of that language." *Waste Mgmt., Inc. v. Rice Danis Inds. Corp.*, 257 F. Supp. 2d 1076, 1083 (S.D. Ohio 2003) (citing cases).

The court's role in interpreting a contract is to "give effect to the intent of the parties." *Goodyear Tire and Rubber Co. v. Lockheed Martin Corp.*, 622 F. App'x 494, 497 (6th Cir. 2015) (citing *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011)). The court reads the contract as a whole and interprets the words of the contract "according to their plain meaning." *Richelson v. Liberty Ins. Corp.*, 796 F. App'x 277, 281 (6th Cir. 2020) (quoting *Boone Coleman Constr., Inc. v. Piketon*, 50 N.E.3d 502, 515 (Ohio 2016)).

Contractual language is ambiguous where its meaning cannot be determined from the four corners of the contract or where it can reasonably be interpreted in more than one manner. *Savedoff*, 524 F.3d at 763. "When both parties offer 'plausible interpretations of the agreement drawn from the contractual language itself [this] demonstrates that the provision is ambiguous.'" *Salerno v. Steel Plate, LLC*, No. 5:20-cv-1598, 2021 WL 1061939, at *5 (N.D. Ohio Mar. 19, 2021) (quoting *Int'l Union UAW Local 91 v. Park-Ohio Indus., Inc.*, 876 F.2d 894, at *6 (6th Cir. 1989) (table decision)). Only if the contract is ambiguous can the court consider extrinsic evidence to ascertain the parties' intent. *Cal. Fitness I, Inc. v. Lifestyle Fam. Fitness, Inc.*, 433 F. App'x 329, 341 (6th Cir. 2011) (citing *Allason v. Gailey*, 939 N.E.2d 206, 212 (Ohio Ct. App. 2010)). The court may consider extrinsic evidence "to interpret, but not to contradict, the

express (ambiguous) language." *Bondex Int'l, Inc. v. Hartford Acc. & Indem. Co.*, 667 F.3d 669, 680 (6th Cir. 2011) (citing Ohio cases).

### C. Analysis

Plaintiffs argue the term "other benefits relating to periods prior to the Closing Date" encompasses the true-up and COVID-19 Dividend payments made by the BWC because those benefits were based on payments made by plaintiffs through RGT Management to the BWC pursuant to their Management Agreement. Plaintiffs argue that under the Management Agreement with RGT Management, plaintiffs paid the workers' compensation premiums to RGT Management who in turn submitted them to the BWC as part of RGT Management's management duties.

Defendant argues that the term "other benefits" in Section 1.2.2 does not include the payments defendant received from the BWC because "other benefits" is limited to tax-related benefits. Defendant contends that the placement of the contractual term "other benefits" after the terms "tax credits, tax refunds, [and] tax benefits" indicates "other benefits" was intended to convey "tax-related" types of benefits, such as loss carryover, depreciation, rebates, and deductions attached to the business prior to closing.

In addition, defendant contends that even if the term "other benefits" is broad enough to encompass the BWC payments here, they are not "assets" of plaintiffs subject to the Section 1.2.2 exclusion. Rather, any such assets would belong to RGT Management, a non-party to the Agreement and the only entity that had an account with the BWC. Defendant alleges Section 1.2.2 excludes any reference to the BWC, workers compensation insurance, and non-party RGT Management, thereby evincing the parties' intent that dividend or true-up payments from the BWC are not considered "other benefits."

11

### 1.  "[O]ther benefits relating to periods prior to the Closing Date."

Section 1.2.2 of the Agreement excludes from transferrable assets "any tax credits, tax refunds, tax benefits, or other benefits relating to periods prior to the Closing Date."  (Doc. 1-1 at PAGEID 9).  The Agreement does not define the terms tax refund, tax credit, tax benefit, or "other benefits relating to periods prior to the Closing Date," which are at issue here.  (*Id*. at PAGEID 40-41).  Under Section 1.1 of the Agreement governing the "Sale of Assets," the term "Assets" includes both tangible and intangible assets, "whether or not reflected on the books and records of PSP" but "shall not include the exclusions set forth in <u>Section 1.2</u> herein. . . ."  (*Id.* at PAGEID 8).  Section 1.2 of the Agreement governing "Excluded Assets" sets forth a variety of items that are "excluded from the definition of Assets," which shall not be conveyed to defendant.  (*Id.* at PAGEID 9-10).  This includes "other benefits relating to periods prior to the Closing Date."  (*Id*. at PAGEID 9, Section 1.2.2).

The Court finds the plain and ordinary language of Section 1.2.2 "other benefits relating to periods prior to the Closing Date" is not limited to "tax-related" benefits as defendant contends.  To interpret the language as restricting "other benefits" to solely tax-related benefits as defendant urges would render the preceding term "tax benefit" meaningless because the term "tax benefit" already encompasses "benefits" like loss carryover, depreciation, rebates, and deductions attached to the business prior to closing.  The Court must "presume that words are used for a specific purpose" and strive to "avoid interpretations that render portions meaningless or unnecessary."  *Wohl v. Swinney*, 888 N.E.2d 1062, 1066 (Ohio 2008).  The language used by the parties is broad and clear, providing that the Sellers (plaintiffs) retained "other benefits" if related to periods prior to the Closing Date, not just tax-related benefits.  This reading is consistent with the Agreement as a whole and particularly with respect to "Retained Liabilities"

under Section 1.4 of the Agreement. That provision specifies that the Buyer (defendant) "shall not assume" any liabilities of the Seller (plaintiffs) except for the "Assumed Liabilities" set forth in Section 1.3 of the Agreement. (Doc. 1-1 at PAGEID 10, Section 1.4). Section 1.4 governing "Retained Liabilities" provides, "For clarification, Retained Liabilities include all of Seller's [plaintiffs'] liabilities under its Benefit Plans, Seller's taxes and any and all wages and compensation, including accrued vacation and sick pay, owed to the Restaurants Employees by PSP prior to Closing and due to the termination of their employment by PSP on the Closing Date." (*Id.*). Thus, under the Agreement, plaintiffs retained their pre-closing obligations for taxes, wages, and compensation—which would necessarily include employer obligations like workers compensation premiums—for plaintiffs' employees which accrued prior to the closing date. Under the plain language of Section 1.4, for example, had plaintiffs underpaid workers compensation premiums for the pre-closing time period, the Agreement would obligate plaintiffs, and not defendant, to assume liability for these underpayments. Reading Sections 1.2 and 1.4 and the Agreement as a consistent whole, and giving the words of the Agreement their plain meaning, the term "other benefits relating to periods prior to the Closing Date" is not limited to tax-related benefits and potentially includes BWC payments like those at issue in this case. *Richelson*, 796 F. App'x at 281.

### 2. The True-Up Payment

Resolution of what may constitute an excluded asset under Section 1.2.2 of the Agreement does not answer the question of whether the true-up refund and COVID dividend are *PSP's* excluded assets. The Court starts with the true-up payment made by the BWC to defendant.

Defendant argues that "[n]either Plaintiff had any contract with the Ohio Bureau of Workers['] Compensation and therefore had no rights to any benefits that either claim due from the Ohio Bureau of Workers['] Compensation[.]" (Doc. 24 at PAGEID 204). Defendant further argues that even if plaintiff PSP could legally claim the BWC distributions, the execution of the U-118 Form by defendant and non-party RGT Management transferred all the rights and obligations of RGT Management, including its liability for worker's compensation premiums, from RGT Management to DJ Steakburgers. Defendant contends that it is the only entity eligible to receive the BWC true-up refund. (*Id*. at PAGEID 204, 206-07). Defendant argues plaintiff PSP therefore has no right to the BWC true-up distribution.

Plaintiffs argue that pursuant to the Management Agreement between plaintiff PSP and RGT Management, plaintiffs paid workers compensation premiums on behalf of its employees to RGT Management who then paid the premiums into the BWC account on PSP's behalf. Plaintiff PSP, which "own[ed] the Freddy's Frozen Custard and Steakburgers restaurant franchise agreements," entered into a Management Agreement with non-party RGT Management, which has "special expertise and experience in the operation, management and marketing of Freddy's Frozen Custard and Steakburgers restaurants" for the purpose of "provid[ing] certain management services" to plaintiff PSP. (Doc. 34-1 at PAGEID 441). Pursuant to the Management Agreement, RGT Management agreed, in pertinent part, to "establish office, accounting and administrative procedures at the Restaurants" and "oversee and manage the day-to-day operations of the Restaurants." (*Id*.; *see also Id*., Kimberly Wimberly Aff., at PAGEID 437). Under this Management Agreement, RGT Management "would handle various functions overseeing the operations of the restaurants, which included maintaining an account with the Ohio Bureau of Workers' Compensation ('BWC') for employees at or below the level of store

14

manager." (*Id.*, ¶ 5 at PAGEID 438). "While RGTM [RGT Management] held the BWC account and remitted premiums, RGTM did not use its own funds to pay these premiums. PSP remained responsible for funding the BWC account, and periodically transferred to RGTM the funds with which to make premium payments." (*Id.*, ¶ 6 at PAGEID 438). Plaintiffs contend that because RGT Management maintained the BWC account on PSP's behalf and PSP funded the BWC premiums, PSP was entitled to the true-up refund based on the periods prior to the Closing Date.

The Court determines that PSP is entitled to the BWC true-up payment. The fact that PSP never paid any premiums directly to the BWC or received any rebate, credit, true-up payment, dividend or other benefit from the BWC directly prior to the Closing Date is not dispositive. The Court is not persuaded by defendant's argument that the holding of the BWC account in the name of RGT Management determines the legal ownership of this asset under the Agreement, which governs this dispute.

PSP outsourced management of certain operational functions to RGT Management, including its account with the BWC, pursuant to a Management Agreement. (Doc. 23-2, ¶ 4; Doc. 34-1, ¶¶ 5-6). RGT Management maintained the account with the BWC, but PSP was responsible for funding the BWC premiums. PSP transferred these premium payments to RGT Management, which then remitted the payments to the BWC for restaurant employees. (*Id.*). PSP funded those premiums and, when appropriate, received refunds and dividends from the BWC through RGT Management. (Doc. 24-5 at PAGEID 315, 319).

Defendant does not dispute that PSP actually paid the workers compensation premiums to RGT Management, which then deposited such funds into the BWC account on behalf of all the Freddy's Restaurants owned by PSP. The true-up refund at issue represented an overpayment of

premiums already paid by PSP during the July 1, 2019-June 30, 2020 policy year. As such, under the terms of the Agreement, the true-up payment is a PSP "asset," which is excluded from transfer to defendant as a "benefit relating to periods prior to the Closing Date."

Defendant also argues that even if the true-up payment is considered a PSP asset, RGT Management, via the U-118 Form, transferred all the rights and obligations of RGT Management, including its liability for workers' compensation premiums, from RGT Management to DJ Steakburgers. This argument ignores the legal effect of the Agreement, which was entered into on June 25, 2020 and closed on September 15, 2020. The signing and closing on the Agreement occurred prior to the execution of the U-118 Form in October 2020. PSP's right to certain "Excluded Assets," including "other benefits relating to periods prior to the Closing Date," arose by virtue of the Agreement and were set by September 15, 2020, when the closing occurred. (Doc. 1-1 at PAGEID 38, Section 11.14). Any rights or obligations possessed by RGT Management and transferred to defendant in October 2020 when it executed the U-118 Form would not have included PSP's right to the true-up payment, which previously arose under the Agreement. Defendant has not cited any authority that under these circumstances, the U-118 Form overrides the plain language of the Agreement and the contractual commitments made by the parties to each other. Therefore, because there exists no genuine issue of material fact that plaintiffs are entitled to the true-up refund, the Court grants plaintiffs' motion for summary judgment on plaintiffs' breach of contract claim concerning the $2,325.48 true-up refund.

### 3. The COVID Dividend Payment

Plaintiffs argue that they are entitled to the COVID Dividend payment because it constitutes an "Excluded Asset" under the Agreement. (Doc. 23-1 at PAGEID 154). Pointing to Section 1.2.2 of the Agreement, plaintiffs contend that the COVID Dividend constitutes an

16

"Excluded Asset" because it is a "benefit relating to periods prior to the Closing Date" because the BWC "determined the eligibility for the COVID Dividend from payment of premiums during the July []1, 2019-Jun[e] 30, 2020 policy year—a period entirely before the September 15, 2020 Closing Date, during which RGT Management paid all premiums." (*Id.*, citing Doc. 1-1 at PAGEID 9). Accordingly, plaintiffs argue that summary judgment should be granted in their favor because as an "Excluded Asset," the COVID Dividend properly belongs to plaintiffs. (*Id.*).

In contrast, defendant argues that the COVID Dividend is not an "Excluded Asset" under Section 1.2.2 of the Agreement because the BWC specified that a successor employer would receive the dividend if a company was sold prior to the distribution of the dividend. (Doc. 24 at PAGEID 211, citing Doc. 24-5 at PAGEID 344-48). Citing the U-118 Form, defendant contends it was the "successor employer" and current business owner with the employees. (*Id.*, citing Doc. 24-5 at PAGEID 307-09). Defendant argues that it is undisputed that plaintiffs did not have an active status with the BWC as of October 2, 2020. (*Id.* at PAGEID 212).

Defendant further argues that Section 1.2.2 of the Agreement cannot be expanded to include "dividends" because doing so would be unsupported by the contract language. (*Id.* at PAGEID 213-16). Defendant states that even if the COVID Dividend is a "benefit relating to periods prior to the Closing Date," as contemplated by Section 1.2.2 of the Agreement, defendant is entitled to receive the COVID Dividend because it is "based on post-closing actions and circumstances." (*Id.* at PAGEID 216-17).

The Court finds that the COVID Dividend is not an "Excluded Asset" under Section 1.2.2 of the Agreement because it does not qualify as a "benefit relating to periods prior to the Closing Date" under the Agreement. Under Ohio Admin. Code 4123-17-10, the BWC has the sole "authority and discretion" to decide "whether there is an excess surplus of premium" and, more

importantly, "whether to return the excess surplus to employers. . . ." Thus, an employer can have no expectation of a return of excess premiums in any given year. At the times the parties entered into the Agreement to exclude certain benefits, they could not have contemplated the exclusion of a benefit that had not yet been authorized – and may never have been authorized – by the BWC in its sole discretion. Unlike the BWC refund of premiums overpaid by plaintiff PSP based on the BWC annual true-up reconciliation process, the parties could not have contemplated that the BWC would authorize this COVID Dividend in November 2020.

More importantly, eligibility for the COVID Dividend itself arose after the closing date and was dependent on post-closing criteria. The fact that the formula for determining the amount of the dividend was based on a percentage of past premiums does not transform the COVID Dividend into a "benefit relating to periods prior to the Closing Date." Eligibility for this benefit was tied to an employer's status as of October 2, 2020, which was after the closing date. In determining eligibility, the BWC required, *inter alia*, that "[t]he employer must be in an active, reinstated, combined, cancelled – business sold, or debtor-in-possession status or, in a lapsed status with a lapse date of Jan. 1, 2020 or later *as of October 2, 2020*." (Doc. 23-5 at PAGEID 180) (emphasis added). Likewise, the BWC stated that "[e]ligibility [for the COVID Dividend] was based on an *employer's status* (active, lapsed) *with us **as of October 2**. . . .*" (*Id.*) (emphasis added).

As of October 2, 2020, plaintiffs were no longer the designated employer of any Restaurant employees. Notably, on the U-118 Form, RGT Management stated that the Restaurants were sold on September 14, 2020, and the last date that it employed any employees in Ohio was September 29, 2020. (Doc. 24-5 at PAGEID 307). RGT Management also specified that it did not operate any additional Ohio locations under the stated policy. (*Id.*).

18

Accordingly, as of October 2, 2020, the BWC's effective date for determining employer eligibility for the COVID Dividend, it is undisputed that plaintiffs did not operate any restaurants, or have any employees, in Ohio.[1] Further, it is undisputed that as of October 2, 2020, the employer of record for the Restaurants was defendant, who had hired all of plaintiffs' former 315 employees in connection with the purchase of the Restaurants. (Doc. 24-5 at PAGEID 307-08). Because eligibility for the COVID Dividend payment was tied to an employer's status as of October 2, 2020, after the closing date and when plaintiffs no longer qualified as employers, the COVID Dividend could not have been a "benefit relating to periods prior to the Closing Date" and an "Excluded Asset" under Section 1.2.2 of the Agreement.

Therefore, because there exists no genuine issue of material fact that defendant is entitled to the COVID Dividend, the Court grants defendant's motion for summary judgment on plaintiffs' breach of contract claim concerning the COVID Dividend.

### 4. Unjust enrichment

Defendant moves for summary judgment on plaintiffs' cause of action for unjust enrichment.[2] Plaintiffs' unjust enrichment claim is based on defendant's retention of the COVID Dividend and true-up refund distributions. (Doc. 1 at PAGEID 59-60). Plaintiffs allege that defendant received a benefit conferred by plaintiffs by obtaining the two BWC distributions. Plaintiffs contend that defendant had knowledge of this benefit by retaining this benefit despite plaintiffs' request for payment. (*Id*.). Plaintiffs further allege that defendant "received these

---

[1] Plaintiffs argue that they "still operate restaurants in Ohio." (Doc. 26 at PAGEID 377). This statement, however, is unsupported by any evidence in the record.

[2] The Court notes that in plaintiffs' motion for summary judgment, plaintiffs only "move for summary judgment in their favor on their First Cause of Action for Breach of Contract" against defendant. (Doc. 23 at PAGEID 140). Nowhere in plaintiffs' motion for summary judgment do plaintiffs argue that the Court should grant summary judgment on their second cause of action for unjust enrichment. In their response in opposition, however, plaintiffs state they "are entitled to summary judgment on their breach of contract claim *or, in the alternative, their unjust enrichment claim*." (Doc. 26 at PAGEID 371) (emphasis added).

payments from the Bureau entirely due to Plaintiffs' payment of prior premiums" and "it would be unjust for DJ Steakburgers to retain that benefit." (*Id*. at PAGEID 60).

Under Ohio law, a claim of unjust enrichment has the following elements: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *In re Whirlpool Corp. Front–Loading Washer Products Liability Litig*., 684 F. Supp. 2d 942, 951 (N.D. Ohio 2009) (quoting *Hambleton v. R.G. Barry Corp*., 465 N.E.2d 1298, 1302 (Ohio 1984)). However, "[u]nder Ohio law, a plaintiff may not recover under the theory of unjust enrichment when an express contract covers the same subject." *Bihn v. Fifth Third Mortg. Co*., 980 F. Supp. 2d 892, 904 (S.D. Ohio 2013) (citing *Wuliger v. Mfrs. Life Ins. Co. (USA)*, 567 F.3d 787, 799 (6th Cir. 2009)). *See also Terry Barr Sales Agency, Inc. v. All-Lock Co*., 96 F.3d 174, 181 (6th Cir. 1996) ("Where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for . . . unjust enrichment."). "When a contract governs the parties' relationship, recovery under an unjust enrichment theory is precluded unless there is evidence of fraud, illegality, or bad faith in the formation of the contract." *Gregoire v. Rice Drilling D. LLC*, No. 2:21-cv-4631, 2021 WL 9967132, at *3 (S.D. Ohio Nov. 17, 2021) (citing cases).

It is undisputed that there exists a valid and enforceable contract between the parties (Doc. 1-1; *see also* Doc. 23-1 at PAGEID 145), and neither plaintiffs nor defendant allege that fraud, bad faith, or illegality are present in this matter. Further, the benefit that plaintiffs allege they conferred on defendant, and the payments to which plaintiffs claim they are entitled to, i.e., the COVID Dividend and true-up refund distributions, are governed by the provisions of the Asset Purchase Agreement relating to Excluded Assets. Specifically, Section 1.2.2 of the Asset

20

Purchase Agreement states that "other benefits relating to periods prior to the Closing Date" are excluded assets and shall not be conveyed to defendant. (Doc. 1-1 at PAGEID 9). In plaintiffs' breach of contract claim, plaintiffs argue the COVID Dividend and true-up refund distributions are excluded assets under Section 1.2.2 of the Asset Purchase Agreement because they constitute "other benefits relating to periods prior to the Closing Date." (*See* Doc. 23 at PAGEID 153-55). Plaintiffs specifically argue that these distributions belong to plaintiffs "by operation the Agreement." (*Id*. at PAGEID 155).

Because the Asset Purchase Agreement is a valid and express contract that governs the subject matter of plaintiffs' cause of action for unjust enrichment, and neither party disputes the existence or enforceability of this Agreement, Ohio's general rule applies and forecloses plaintiffs from proceeding with their claim for unjust enrichment. Accordingly, defendant's motion for summary judgment on plaintiffs' unjust enrichment claim is granted. *See Julie Maynard, Inc. v. Whatever It Takes Transmissions & Parts, Inc*., No. 3:19-cv-238, 2022 WL 1016735, at *11 (S.D. Ohio Apr. 5, 2022) (granting summary judgement where an express contract covered the same subject matter asserted in the unjust enrichment claim) (citing *LeVangie v. Raleigh*, No. 27946, 2019 WL 1092709, at *4 (Ohio Ct. App. 2019)).

Even if an express contract did not preclude an unjust enrichment claim as a matter of law, plaintiffs cannot establish the third element of their claim. Eligibility for the COVID Dividend is premised on an employer's status as of October 2, 2020, and as explained above, plaintiffs did not qualify as the employer of the Restaurants after the closing date. Therefore, it would not be unjust for defendant to retain the COVID Dividend payment.

### 5. Defendant's counterclaim for breach of contract on escrow funds

Defendant seeks summary judgment on its counterclaim for breach of contract against plaintiffs based on plaintiffs' refusal to release funds held in escrow allegedly owed to defendant.

21

In the counterclaim, defendant alleges that the sale of the Restaurants included the amount of the cash banks and inventories in excess of $75,000.  (Doc. 8 at PAGEID 76, citing Doc. 1-1 at PAGEID 12).  Section 2.4 of the Asset Purchase Agreement provides that the day prior to the closing date, the parties shall conduct a joint inventory to determine the amount of inventory and cash banks in the Restaurants.  (Doc. 1-1 at PAGEID 13).  Under the Agreement, plaintiff PSP shall reimburse defendant for the excess amount paid at closing for the inventory and cash banks. Defendant alleges that the parties "conducted a physical inventory of the food products and Cash Banks and the $75,000 estimated value was reduced to $50,300 actual value of the food inventory and Cash Banks." (Doc. 8 at PAGEID 77).  Defendant alleges the "balance of the funds in the amount of $24,700 is being held in escrow by the Closing Escrow Agent" and these "funds can only be released from Escrow by agreement of the Plaintiffs and the Defendant or by a final non appealable court order."  (*Id.*).  Defendant alleges that plaintiffs refused defendant's demand to release these funds held in escrow, and plaintiffs' "refusal to consent to the release of the Escrow Funds constitutes a breach of contract. . . ."  (*Id.*).

In its motion for summary judgment, defendant attached an unauthenticated "spreadsheet" purportedly created by plaintiffs "reflecting a balance of '21,462.16 total refundable to buyer.'"  (Doc. 24 at PAGEID 219, quoting Doc. 24, Ex. N, at PAGEID 351).  In defendant's motion for summary judgment, defendant stated it "will not dispute this material fact and requests the $21,462.12 owed to it, as provided by Plaintiffs." (*Id.*).  Defendant also attached an unauthenticated email dated February 15, 2021 purportedly from Steve Garea, who may be an attorney for DJS,[3] who states, "The amount due to Buyer is $21,462.18.  Upon your review of the attached please send all parties to this email your concurrence or disagreement with

---

[3] *See* Doc. 24-5, Ex. M.

the amount due. If you dispute the amount due please set forth the reason for the dispute. Upon finalization, please send a check for $21,462.18 to the Buyer." (*Id*., Ex. O, at PAGEID 353). Defendant argues that summary judgment should be granted in its favor "on its claim for breach of contract concerning the escrow funds as Plaintiffs admit they are holding $21,462.12 in the escrow account, contrary to the plain language of the contract." (Doc. 24 at PAGEID 219).

Plaintiffs argue that defendant is not entitled to summary judgment because a genuine dispute of material fact exists as to the total amount due under the Agreement and whether the Inventory and Cash Bank true-up remain escrowed. (Doc. 26 at PAGEID 386). Plaintiffs argue that while "some amounts remain in escrow," plaintiffs "never specified that the moneys subject to this true-up were specifically escrowed." (*Id*., citing Doc. 10 at PAGEID 84). Plaintiffs further argue that "there remains an active dispute about the amount actually owed, as Plaintiffs and Defendant had 'engaged' over 'multiple post-closing issues that could implicate escrow,' not simple the Inventory and Cash Bank true-up." (*Id*.; *see also* Doc. 28 at PAGEID 420).

The Court is without sufficient evidence to find no genuine issue of fact as to the amount held in escrow and owed to defendant based on the unauthenticated and hearsay evidence presented. Accordingly, defendant's motion for summary judgment on its counterclaim for breach of contract concerning the funds held in escrow is denied.

## IV. Conclusion

In sum, the Court grants plaintiffs' motion for summary judgment on plaintiffs' breach of contract claim concerning the $2,325.48 true-up refund because there exists no genuine issue of material fact that plaintiffs are entitled to the true-up refund. Moreover, because there exists no genuine issue of material fact that defendant is entitled to the $69,746.86 COVID Dividend, the Court grants defendant's motion for summary judgment on plaintiffs' breach of contract claim

23

concerning the COVID Dividend.  The Court further grants defendant's motion for summary judgment on plaintiffs' unjust enrichment claim and denies defendant's motion for summary judgment on defendant's counterclaim for breach of contract concerning the funds held in escrow.

**IT IS THEREFORE ORDERED THAT:**

**1.**  Defendant's motion for summary judgment (Doc. 24) is **GRANTED** on plaintiffs' breach of contract claim concerning the COVID Dividend (Count I) and for Unjust Enrichment (Count II).  Defendant's motion is **DENIED** in all other respects.

**2.**  Plaintiffs' motion for summary judgment (Doc. 23) is **GRANTED** on their breach of contract claim concerning the true-up refund distribution (Count I).  Plaintiffs' motion is **DENIED** in all other respects.

Date: 3/17/2023

Karen L. Litkovitz
Chief United States Magistrate Judge